Robert R. ROSEN, d/b/a Robert R. Rosen Associates and Harold Murray, d/b/a Murray Drafting Services, Petitioners,

v.

BUREAU OF PROFESSIONAL AND OCCUPATIONAL AFFAIRS, STATE ARCHITECTS LICENSURE BOARD, Respondent.

Commonwealth Court of Pennsylvania.

Argued March 7, 2000.

Decided Dec. 13, 2000.

Sheldon L. Albert, Philadelphia, for petitioners.

Leonidas Pandeladis, Harrisburg, for respondent.

Before DOYLE, President Judge, KELLEY, Judge, and NARICK, Senior Judge.

DOYLE, President Judge.[1]

Robert R. Rosen (Petitioner Rosen), d/b/a Robert R. Rosen Associates,[2] and Harold Murray (Petitioner Murray), d/b/a Murray Drafting Services (collectively "Petitioners"), appeal from an order of the Bureau of Professional and Occupational Affairs (Bureau), State Architects Licensure Board (Board), enjoining Petitioners from engaging in the practice of architecture without a license and imposing civil penalties on Petitioner Rosen in the amount of $1,000.00 and on Petitioner Murray in the amount of $300.00.

The sole issue before the Court is whether the Architects Licensure Law (Architects' Law)[3] and the Engineer, Land Surveyor and Geologist Registration Law (Engineers' Law)[4] are *in pari materia*,[5] requiring that they be construed together so as to achieve a consistent result.

The relevant facts are as follows. Charles Bowser, Esq., a prominent Philadelphia lawyer, owns a four-story building in Philadelphia that was previously used as a private club. He sought to renovate the structure into law offices and hired Murray to survey the building and create a set of drawings based on Bowser's conception of the renovation project. The project called for the conversion of the first three floors into law offices and the conversion of the fourth floor into an apartment. The most substantial aspect of the renovation involved the addition of an elevator shaft to the rear of the building and reinforcement of the first floor to accommodate a law library. The renovation would leave

1. This matter was reassigned to the opinion writer on October 3, 2000.

2. Robert R. Rosen Associates is a professional engineering firm.

3. Act of December 14, 1982, P.L. 1227, *as amended,* 63 P.S. §§ 34.1–34.22.

4. Act of May 23, 1945, P.L. 913, *as amended,* 63 P.S. §§ 148–158.2.

5. Section 1932 of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1932, states:

> (a) Statutes or parts of statutes are in pari materia when they are related to the same persons or things or to the same class of persons or things.
>
> (b) Statutes in pari materia shall be construed together, if possible, as one statute.
>
> In addition, our Supreme Court has indicated that statutes may be *in pari materia* when they encompass "the same subject matter." *Hamilton v. Unionville–Chadds Ford School District,* 552 Pa. 245, 249, 714 A.2d 1012, 1015 (1998).

the facade of the building substantially unaltered, and ingress and egress to the building unchanged.

Satisfied with the proposed plans, Bowser notified Murray that he desired to proceed with construction, but was informed by Murray that he would have to hire a licensed design professional to approve the structural integrity of the proposed alterations and to affix a professional seal to the drawings so that the City would issue the necessary building permits. Bowser then contacted Charles Lomax, a licensed professional architect, who reviewed the renovation plans and agreed to manage the project. Bowser subsequently declined to hire Lomax because his fee was too high, and requested that Murray recommend another design professional who could review, approve, and seal the drawings. Murray contacted Rosen, owner of a professional engineering firm, who reviewed the drawings, and agreed to manage the project for a fee acceptable to Bowser. Following Rosen's application of his professional seal on the plans, the City issued the necessary permits to renovate the building. Upon learning that an engineer had sealed the design documents, Lomax filed a complaint with the Architects Licensure Board asserting that Petitioners had engaged in the practice of architecture without a license in violation of section 18(a) of the Architects' Law. 63 P.S. § 34.18(a).

Acting on Lomax's complaint, the Bureau issued a rule to show cause why civil penalties should not be imposed against Petitioners. Following Petitioners' answer, the Board appointed a hearing examiner who conducted a hearing wherein the parties presented expert testimony addressing the degree to which the project involved the disciplines of architecture and engineering. The Bureau presented the testimony of its own investigating officer and two registered architects, Lomax and Harry Rutledge. Both Petitioners, Rosen and Murray, testified, but the hearing examiner excluded the testimony of their expert witness. Following an appeal to the Board by the Petitioners, the Board remanded the matter to the hearing examiner with instructions to admit the expert's testimony after reaching the conclusion that the testimony was improperly precluded on procedural grounds. On remand, Petitioners presented the testimony of Artis T. Ore, a contractor, and Barton Klingerman, a registered professional engineer. The Board's expert witnesses and Petitioners' expert witness all testified that the project at issue was simultaneously "architectural" **and** "engineering" in nature, differing only as to the estimated percentage that they allocated to each field. Thereafter, the hearing examiner credited the Bureau's expert testimony, which indicated that the project was 80% architectural and 20% engineering work. The hearing examiner discredited Petitioners' witnesses and issued a proposed adjudication concluding that Petitioners had violated Section 18(a) of the Architects' Law governing the unauthorized practice of architecture. The Board adopted the hearing examiner's proposed adjudication and imposed a civil penalty of $1,000 against Rosen and $300 against Murray. This appeal ensued.[6]

Initially we must look at Section 3 of the Architects' Law, which defines the practice of architecture as follows:

> **"Practice of Architecture."** The rendering or offering to render certain services, hereinafter described, in connection with the design and construction of a structure or group of structures which

---

6. This Court's standard of review in an appeal from an agency adjudication is limited to determining whether constitutional rights were violated, an error of law was committed or whether necessary findings of fact are supported by substantial competent evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704. Substantial evidence has been defined as such relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Singer v. Bureau of Professional and Occupational Affairs, State Board of Psychology,* 159 Pa.Cmwlth. 385, 633 A.2d 246 (1993).

have as their principal purpose **human habitation** *or use,* and the utilization of space within and surrounding such structures. The services referred to in the previous sentence include planning, providing preliminary studies, designs, drawings, specifications, and other design documents, construction management and administration of construction contracts. **The foregoing shall not be deemed to include the practice of engineering as such, for which separate registration is required under the provisions of the [Engineers' Law], excepting only engineering work incidental to the practice of architecture.**

63 P.S. § 34.3 (emphasis added).

We are then obliged to consider Section 2 of the Engineers' Law, which defines the practice of engineering as:

(a)(1) **"Practice of Engineering"** shall mean the application of the mathematical and physical sciences for the **design of public or private buildings,** structures, machines, equipment, processes, works or engineering systems, and the consultation, investigation, evaluation, engineering surveys, construction management, planning and inspection in connection therewith, the performance of the foregoing acts and services being prohibited to persons who are not licensed under this act as professional engineers unless exempt under other provisions of this act.

\* \* \* \*

(3) **The forgoing shall not be deemed to include the practice of architecture as such, for which separate registration is required under [the Architects' Law], excepting only architectural work incidental to the "practice of engineering."**

63 P.S. § 149(a)(1), (3) (emphasis added).

The instant appeal represents, in our view, an ongoing turf war between these two learned professions over the application of their professional disciplines to the

design of buildings, and to the construction and renovation of buildings and structures within the Commonwealth of Pennsylvania. On appeal, Petitioners concede that while these two professional disciplines are different, there are substantial areas which overlap relating to the design, construction and renovation of structures. Petitioners further maintain that the purpose of the two professional regulatory statutes is to protect the *public safety* rather than to protect the private interests of one discipline over the other. Petitioners argue that, as a matter of statutory construction, sections of the Architects' Law, essentially 63 P.S. § 34.3, and the Engineers' Law, essentially 63 P.S. § 149, should be read *in pari materia,* thus harmonizing each statute's relevant provisions to give a uniform effect to each. Petitioners assert that such a construction would preclude sanctions in the instant matter because the services rendered on the renovation project in this case may legitimately be regarded as within the reach of *both* the architectural and engineering disciplines. The Board, on the other hand, asserts that it properly applied the Architects' Law to the record evidence and that substantial evidence supports its findings and conclusions.

█ We conclude that these two statutes should be read *in pari materia* because each statute explicitly recognizes that there is indeed an overlapping of the professions, and neither one establishes a clear, mutually exclusive, delineation between the two.

█ The primary purpose of the Architects' Law is to protect "the health, safety and property of the people of the Commonwealth ...," [7] and this goal is to be accomplished by allowing no one to practice architecture unless that person has the qualifications and competency required by the statute. *See, i.e., Baker v. Chambers,* 183 Pa.Super. 634, 133 A.2d 589 (1957) (awarding compensation to a li-

7. 63 P.S. § 34.2.

censed architect employed by an engineering firm); *Rudy v. Friedman,* 54 D. & C.2d 628 (1971) (denying compensation to the estate of an individual who performed architectural services without being registered as an architect).

Likewise, the primary purpose of the Engineers' Law is also to "safeguard life, health or property...." 63 P.S. § 150(a). *See, i.e., Lindholm v. Mount,* 163 Pa.Super. 36, 60 A.2d 422 (1948) (denying compensation to an individual who performed engineering services without being registered as an engineer). Therefore, the primary purpose of *both* licensing laws is to protect the lay public and their property by assuring, subject to limited exceptions, that a licensed architect or a licensed engineer will be retained when the client requires their professional services to guarantee the structural integrity of all manner and types of buildings and construction, including, but certainly not limited to, bridges, subways, office buildings, multilevel garages, stadiums, etc. Obviously, the purpose of these regulatory statutes is **not** to erect unreasonable barriers or boundaries between the two professions, or to carve out areas of "turf" for one profession at the expense of another. Each profession is regulated, therefore, primarily to ensure that there are fundamental baseline standards with regard to education and experience for each, and the fact that there is no clear mutually exclusive demarcation between the two professions is acknowledged in both licensing laws. Each relates to the application of professional mathematical knowledge to the planning and design of structures, and the supervision of their erection. The waters are palpably muddied by provisions in both statutes which allow architects to practice engineering and professional engineers to practice architecture, if the practice of the allied profession is **incidental** to the practice of the profession for which the practitioner had been registered. Moreover, and more to the point, while the definitions of the two disciplines may appear superficially to be mutually exclusive, a close inspection of the definition in each statute belies such an all-encompassing division.

In analyzing the problem, we refer first to *McKeown v. State Architects Licensure Board,* 705 A.2d 524 (Pa.Cmwlth.1998), where we reviewed the Architects' Law relative to the alleged unlawful practice of architecture by a contractor. We there refused to adopt a strict *per se* application of the definition of architecture in the Architects Law and stated:

> Although [the Architects'] Law defines the practice of architecture in such a way that almost any offer of design services would constitute a violation, a per se application of the definition would result in the imposition of penalties on persons who never contemplated an offer to provide architectural design documents.

*Id.* at 527.

Second, Petitioners, unable to find factually analogous appellate precedent in this Commonwealth, have called our attention to other jurisdictions to support their position. They principally rely on *Verich v. Florida State Board of Architecture,* 239 So.2d 29 (Fla.App.1970), *State of Alabama, Board of Registered Architects v. Jones,* 289 Ala. 353, 267 So.2d 427 (1972), and *Georgia State Board for Examination, Qualification and Registration of Architects v. Arnold,* 249 Ga. 593, 292 S.E.2d 830 (1982).[8] In each of these cases, the respective state architects' licensing board

---

**8.** In addition to *Verich, Jones,* and *Arnold,* Petitioners summarize the decisional law of various states that have addressed issues similar to that raised in the instant matter including: *Rabinowitz v. Hurwitz–Mintz Furniture Co.,* 19 La.App. 811, 133 So. 498 (1931); *Smith v. American Packing & Provision Co.,* 102 Utah 351, 130 P.2d 951 (1942); *Lehmann v. Dalis,* 119 Cal.App.2d 152, 259 P.2d 727 (1953); *Johnson v. Delane,* 77 Idaho 172, 290 P.2d 213 (1955); *People ex rel Aramburu v. City of Chicago,* 73 Ill.App.2d 184, 219 N.E.2d 548 (1966); and *Sardis v. Second Judicial District Court,* 85 Nev. 585, 460 P.2d 163 (1969).

determined that either an engineer or a draftsman had engaged in the practice of architecture without a license. Given the substantial similarity in the statutory language of the licensing statutes summarized in *Verich, Jones,* and *Arnold,* in the interests of brevity we shall only present the relevant portions of Florida's licensing statutes, which define the practice of architecture and engineering as follows:

**Architecture**

[A]ny person who shall be engaged in the planning or design for the erection, enlargement or alteration of buildings for others or furnishing architectural supervision of the construction thereof shall be deemed to be practicing architecture and be required to secure a [license to practice architecture].[9]

\* \* \* \*

**Engineering**

The term professional engineer includes ... any professional service requiring use or knowledge of mathematics and the principles of engineering rendered ... for public or private buildings and any consultation, investigation, plan, design, or responsible supervision of construction in any public or private buildings.[10]

*Verich,* 239 So.2d at 31 (based on F.S. § 467.09(1)(a) and F.S. § 471.02(5)).

In analyzing these definitions of the practice of architecture and engineering, the *Verich* court concluded that Florida's licensing statutes recognized the overlap between these complementary disciplines but did not provide a clear demarcation line for a reviewing court to assess where the practice of one discipline would end and the other begin. *Verich,* 239 So.2d at

31–32. In reviewing their respective state statutes, the *Jones* and *Arnold* courts similarly concluded that the definitions of the two professions focused on similar tasks and activities employed by each in designing structures. *Jones,* 267 So.2d at 430 (although attempting to distinguish the practice of the professions of architecture and engineering the wording of the statutes creates only distinctions without differences); *Arnold,* 292 S.E.2d at 833 (the statutory definition of the practice of architecture is sufficiently broad as to include the design drawings of engineers and various construction tradesman, and thus provides no basis to distinguish the practice of architecture from engineering).

We have found this review of the case law from our sister jurisdictions to be instructive regarding our disposition of the present appeal. Our review of *Verich, Jones* and *Arnold,* reveals that the licensing statutes in each case, as here, lacked a clear basis and "bright line" by which to distinguish between the practice of architecture and engineering. In each case the respective courts determined that the statutes at issue defined the practice of these respective disciplines strictly in terms of the types of similar tasks and activities commonly employed in the design and construction of buildings.

The Board argues that, as the only agency within the Commonwealth responsible for regulating the practice of architecture, it is entitled to great deference when interpreting the statutes that it is responsible for overseeing. The Board is correct that the courts of this Commonwealth, faced with interpreting statutory language, afford substantial deference to the interpretation rendered by the admin-

---

9. Florida has subsequently changed its definition of architecture to read: " 'Architecture' means the rendering or offering to render services in connection with the design and construction of a structure or group of structures which have as their principal purpose human habitation or use, and the utilization of space within and surrounding such structures. These services including planning, providing preliminary study designs, draw-

ings and specifications, job-site inspection, and administration of construction contracts." Fla. Stat. ch. 481.203 (2000).

10. Florida has also changed its definition of engineering which is lengthy, more detailed, but substantially the same as the definition recited.

istrative agency overseeing the implementation of such legislation. *Chappell v. Pennsylvania Public Utility Commission,* 57 Pa.Cmwlth. 17, 425 A.2d 873 (1981). However, the present matter involves the administration of overlapping disciplines, which does not render the Board uniquely qualified to interpret both statutes at issue here; and of course, it is necessary to interpret **both** statutes to reach a just result. The Board is not the only agency in the Commonwealth which is charged with the responsibility of regulating the division between these professions and we can envision a situation where the Architects Licensure Board and the State Registration Board for Professional Engineers [11] could each view the *same* work as being essentially within the purview of its own governing statute.

Furthermore, we have also previously held that we need not give deference to an agency where its construction of a statute frustrates legislative intent. *Scanlon v. Department of Public Welfare, Department of Aging,* 739 A.2d 635 (Pa. Cmwlth.1999). Therefore, although courts often defer to an agency's interpretation of the statutes it administers, where, as here, the meaning of the statute is a question of law for the court, when convinced that the agency's interpretation is unwise or erroneous, that deference is unwarranted. *Gilmour Manufacturing Co. v. Commonwealth,* 717 A.2d 619 (Pa.Cmwlth.1998). *See also, McClellan v. Health Maintenance Organization of PA.,* 546 Pa. 463, 686 A.2d 801 (1996); *Philadelphia Fire Officers Association v. Pennsylvania Labor Relations Board,* 470 Pa. 550, 369 A.2d 259 (1977). Moreover, by applying an unwarranted deference standard, we can foresee the real potential that this Court could unwittingly escalate a turf war between the Registration Board for Professional Engineers and the State Architects Licensure Board.

The cornerstone of the Board's conclusion to punish the petitioners in this case is that where a project involves "human habitation or use," the project must perforce be "architecture." The Board asserts that our Architects' Law differentiates the practice of these two learned professions by reserving the design of certain types of structures to the profession of architecture: Specifically, it contends that the Architects' Law provides that only licensed architects may engage in "the design and construction of a structure or group of structures which have as their principal purpose **human habitation or use.**" 63 P.S. § 34.3. The Board maintains that, by focusing on the intended use of the structure, the General Assembly has provided a demarcation line between these overlapping and complementary disciplines.

Petitioners, on the other hand, argue that this view is overly expansive because nearly all buildings and structures are intended for human habitation *or use,* leaving only the design of barns and chicken coups for the engineering profession and we agree with Petitioners that the Board's interpretation is extraordinarily broad. There are few structures that do not have **human habitation or use** as their principal purpose. Even barns and chicken coops have a strong component of human use in their principal purpose. Certainly office buildings do, but so would the multi-level parking garage adjacent to the office building. Workers in industrial and manufacturing facilities, utilities and warehouses would certainly attest to the fact that these facilities are likewise used by human beings. Building code restrictions are no less stringent for these latter facilities, nor are health and sanitation requirements lessened, because the Board may, by definition, place them outside the practice of architecture and, therefore, not primarily for human habitation.

**11.** 63 P.S. § 151.1 creates the *State Registration Board for Professional Engineers, Land Surveyors and Geologists* with the authority to review and determine the unauthorized practice of engineering, and 63 P.S. § 158 provides that a violation of the Engineers' Law results in a criminal conviction, which carries a fine or imprisonment or both.

If anything, the definition of engineering is even broader than the definition of architecture. A careful look at the statute reflects that while architects are limited to designing structures for human habitation or use, engineers are not so limited. Moreover, engineers are not precluded under the Engineers' Law from designing structures for human habitation or use. In *Verich,* the Architect's Board argued that there was an implication that the term "buildings" referenced in the engineering statute meant those of an industrial nature designed primarily to house machinery and equipment rather than designed primarily for human habitation. The court indicated that, if the Florida legislature had intended to limit engineers to the design of industrial buildings, it would have done so. Here, our General Assembly has inserted into the Architects' Law the words "human habitation or use." But the General Assembly has not seen fit, at the same time, to limit the type of buildings that engineers can design. The licensing statute applicable to engineers **does not say** "application of the mathematical and physical sciences for the design of public or private buildings [**not for human habitation or use**]." 63 P.S. § 149(a)(1) (altered from original). We believe, therefore, that the definition under the Engineers' Law is broader than that contained in the Architects' Law. Clearly, the phrase "human habitation or use" limits the range of projects that architects can undertake; but the language in the Engineers' Law does not likewise limit engineers in the same manner.

Furthermore, the Board in this instance failed to conduct a full analysis of the complete issue. The issue here is not only whether Petitioners engaged in the practice of architecture, but whether under Section 2 of the Engineers' Law, 63 P.S. § 149(a)(1), (3), what they did was lawfully encompassed within the practice of engineering. We believe that it was. The practice of engineering, as defined in the statute, permits engineers to design buildings, and engage in construction planning and management. The fact that the practice of architecture encompasses the same activities does not diminish the sphere of the practice of engineering.

We are concerned that, on the testimony entered in this record, had Mr. Lomax been awarded the project, the Engineers' Board could have assessed civil penalties against him for the unauthorized practice of engineering. It is noted that the engineering expert witnesses testified that the project comprised 80% engineering and 20% architecture, even though the architectural expert witnesses testified that the project was 80% architectural and 20% engineering.

The District Court of Appeals of Florida, Fourth District, in *Verich* cogently pointed the way for what the proper conclusion should be in this appeal when it said:

> If the planning and design of a building and the furnishing of supervision of its construction are functions which are encompassed solely within the practice of architecture, then professional engineers are prohibited from engaging in such functions unless incidental to their engineering practice. But paradoxically, the practice of professional engineering expressly includes the planning and design of buildings and the supervision of their construction. **Thus, the apparent conflict can only be resolved by concluding that the statutes mean a registered architect can plan and design and supervise construction of a building as the practice of architecture and a registered professional engineer can plan and design and supervise construction of a building as a professional engineer.** Of course, the professional engineer cannot represent himself as being an architect nor can the architect represent himself as being a professional engineer.

*Verich,* 239 So.2d at 31. (Emphasis added.)

Mr. Rosen was registered as a professional engineer in the State of Pennsylvania. He reviewed and approved the plans of Mr. Murray as a professional engineer. At no time did Mr. Rosen hold himself out to be an architect, nor did he enter into a contract with Mr. Bowser to provide architectural services.

■ Under Section 2 of the Engineers' Law, 63 P.S. § 149, the practice of engineering includes "the design of public or private buildings, structures, machines, equipment, . . ." which contains no delimiter or modifier. Therefore, since the practice of engineering includes the design of buildings and structures, the practices of Petitioners were within the practice of engineering and, as such, fall squarely within the purview of Section 34.15(2), 63 P.S. § 34.15(2). The Board reads the Architects' Law as limiting the practice of engineering, when in fact it limits the practice of architecture.

Accordingly, we reverse the Board in this matter and strike the civil penalties.

### ORDER

**NOW,** December 13, 2000, the order of the Bureau of Professional and Occupational Affairs, Architects Licensure Board, in the above-captioned matter is hereby reversed and we strike the civil penalties assessed against Petitioner Rosen and Petitioner Murray.

Senior Judge NARICK dissents.